UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

GEOFFREY HARISCH,

                        Plaintiff,

               -v-

JOAN CAVORTI GOLDBERG, in her personal
and official capacity; THE TOWN OF NORTH
CASTLE; and THE NORTH CASTLE TOWN
BOARD,

                     Defendants.

------------------------------------------------------------ X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>March 25, 2016</u> |

14-cv-9503 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

        This case grows out of a years-long conflict between the Town of North

Castle's Police Chief, Geoffrey Harisch, and its Town Administrator, Joan Goldberg.

The Police Chief eventually resigned his position and initiated a suit against the

Town Administrator, the Town Board, and the Town itself, alleging, among other

things, that the defendants retaliated against him in violation of the right to free

speech afforded to him by the First Amendment of the Constitution.

        The defendants have moved to dismiss Harisch's amended complaint.  (ECF

Nos. 22 & 25.)  Although that complaint offers a detailed review of the clashes

between Harisch, Goldberg, and the Town Board, as a matter of law none of them

rise to the level of a constitutional violation.  The First Amendment does not commit

the Court to "judicial oversight of communications between and among government

employees and their superiors in the course of official business."  <u>Garcetti v.</u>

<u>Ceballos</u>, 547 U.S. 410, 423 (2006).  It is therefore not implicated by the acts alleged in Harisch's amended complaint.  For this reason, and for the reasons further discussed below, the defendants' motions to dismiss the complaint are GRANTED.

I.    FACTUAL BACKGROUND[1]

     A.    <u>The Events</u>

Harisch has worked for the North Castle Police Department since 1987, and he was promoted to lieutenant in 2004.  (Am. Compl. ¶ 9.)  For many years, Robert D'Angelo was the Chief of the department, and William Fisher was another lieutenant.  (<u>Id.</u> ¶ 17.)  At different times, both Harisch and Fisher had been in charge of the schedule for the department's officers, with Harisch taking over those duties in 2004.  (<u>Id.</u> ¶¶ 24-25, 108.)

Goldberg began working for North Castle in September 2012, after she had been appointed the Town Administrator.  (<u>Id.</u> ¶¶ 11, 14.)  Shortly after Goldberg assumed her position, Chief D'Angelo announced his retirement.  (<u>Id.</u> ¶ 17.)  None of the three lieutenants in the North Castle Police Department (that is, Harisch, Fisher, and another officer, Peter Simonson), had passed the exam required to become the permanent Police Chief.  (<u>Id.</u>)  The Town Board appointed Fisher to be the provisional Chief.  (<u>Id.</u>)

On December 20, 2012, Harisch joined Goldberg and Jamie Norris, the Superintendent of the North Castle Highway Department, for a three hour meeting

---

[1] For purposes of this motion, the Court accepts as true all facts alleged in the Amended Complaint and considers those facts in the light most favorable to the plaintiff.  E.g., <u>Galper v. JP Morgan Chase Bank, N.A.</u>, 802 F.3d 437, 443 (2d Cir. 2015).

at a restaurant in North White Plains.  (Id. ¶¶ 19-20.)  According to Harisch, the meeting was intended to be a secret, and Harisch was off-duty while he attended. (Id.)  Harisch informed Goldberg that Fisher, who had been in charge of police scheduling for a number of years, had run afoul of his contract with the Police Department many times and had allowed others to do the same.  For example, Harisch told Goldberg that Fisher had accrued hundreds of hours more in compensatory over-time than he was allowed, often by misreporting his time worked.  (Id. ¶ 22.)  Harisch further alleged that in 2001 Fisher had attended a baseball game while he was on-duty and was unavailable to help with an emergency, and that he at times claimed to be on-duty when he was working a different job.  (Id. ¶¶ 23, 26.)  In addition, Harisch stated that Fisher had allowed some officers to accrue too much overtime, skip their tours, and take time off they had not earned.  (Id. ¶¶ 22-25.)

Harisch alleges that, as a result of the meeting, "Goldberg would have complete control over [Fisher] based on her newfound, and secret knowledge of his illegal acts."  (Id. ¶ 27.)  Fisher, as provisional Chief, permitted Goldberg to use the North Castle Police Chief's vehicle to attend a conference in Buffalo "without Board approval and in violation of New York's Vehicle and Traffic Laws," and also in violation of "the Town's vehicle policy and the North Castle Compliance Manual." (Id. ¶¶ 29-30.)

In March 2013, Harisch, Fisher, and Simonson took the state Police Chief examination.  (Id. ¶ 31.)  Only Harisch passed.  (Id.)  On June 19, 2013, about three

weeks after the results were published, Goldberg and Harisch met in her office to discuss the position.  (Id. ¶ 34.)  Harisch noted that he had "upset the apple cart" by being the only lieutenant who passed the test, and Goldberg acknowledged that had Simonson passed, he would have been made Police Chief.  (Id. ¶ 35.)  During this meeting, Goldberg made her first salary offer to Harisch.  (Id. 36.)  Although the base salary was higher than Harisch's base salary as a lieutenant, after accounting for additional aspects such as longevity pay and medical insurance, the total compensation was lower.  (Id.)  The offered total compensation was also significantly lower than that being paid to Fisher as provisional Chief, and that which D'Angelo had been paid as the previous Chief.  (Id. ¶ 39.)  And although both of those men, and in fact all police chiefs in Westchester County, had access to a police response vehicle as a take home car, Goldberg denied Harisch similar access.  (Id. ¶¶ 38, 57.)

During the meeting, Goldberg also told Harisch that she intended to create a new position of Police Commissioner, which would be superior to the Chief of Police.  (Id. ¶ 42.)  She also stated her plan to appoint Fisher to the Commissioner position, and to drop the proposal if Harisch turned down the Chief position, which would keep Fisher on as provisional Chief.  (Id. ¶¶ 42, 44.)  Both at the meeting and in a follow-up email, Harisch countered that this plan was unethical and contravened New York State and Westchester County law.  (Id. ¶ 43, 45.)  The creation of this position was discussed at a Town Board meeting on June 26, 2013, at which several

residents spoke against the proposal.  (Id. ¶ 53.)  The position was never created, nor discussed at any further Board meetings.  (Id.)

Harisch and Goldberg met to discuss his compensation as Chief of Police at least six more times between late June and early August 2013.  (Id. ¶ 54.)  Goldberg raised the offered compensation by roughly $2,000 while continuing to threaten to create the Police Commissioner position.  (Id. ¶¶ 55-59.)  Harisch ultimately accepted the offer, and became the North Castle Chief of Police on August 10, 2013.  (Id. ¶ 60.)  His Amended Complaint alleges that the compensation rate was "a retaliatory measure because he had brought to light rampant and long-standing corruption in the police department, information [Goldberg] could no longer utilize for control purposes."  (Id. ¶ 61.)

The conflicts continued.  Goldberg highlighted the comparison between Harisch's salary and D'Angelo's previous salary during a budget meeting.  (Id. ¶¶ 64-65.)  After that meeting, the two met individually and she told Harisch she'd consider giving him $5,000 more in salary after six months and another $5,000 raise and a car when his probationary period ended after a year on the job.  (Id. ¶ 66.)  In December 2013, after Harisch sent an email to Goldberg and the Town Board stating that he would be taking paid time off on two upcoming Fridays, Goldberg replied-all to schedule a disciplinary meeting at which she informed Harisch that he was to request time off rather than simply informing her that he would be taking it.  (Id. ¶¶ 70-71.)

In December 2013, elections for the North Castle Town Board had occurred, but the prior Board was still serving. (Id. ¶ 80.) Goldberg and the Town were facing at least two lawsuits alleging gender and racial discrimination on Goldberg's part, among other alleged wrongs. (Id. ¶ 68.) The then-serving Town Board scheduled sessions to discuss Goldberg's behavior and possible firing. (Id.) In the days before these sessions, Harisch met with then-current and elected members of the Town Board, including Michael Schiliro, a current member of the Board and the Town Supervisor-elect, and informed them of his conflicts with Goldberg. (Id. ¶ 80.) He also told them about the secret meeting in December 2012 and the corruption allegations he had shared with Goldberg, showed them documents purporting to document his allegations, and referenced additional boxes of evidence. (Id. ¶ 81.)

On December 19, 2013, Goldberg sent an email to the current Town Supervisor, Schiliro the Town Supervisor-elect, and a representative from the Westchester County Department of Human Resources. (Id. ¶ 75.) The email stated that Harisch had "indicated that he does not plan to remain in the title [of Chief of Police] past the probationary period," and thus asked that North Castle be included in the upcoming police chief exam. (Id.) The outgoing Town Supervisor shared the email with Harisch. (Id. ¶ 76.)

The next day, December 20, 2013, the Town Board fired Goldberg by a vote of three to two. (Id. ¶ 83.) Schiliro was one of the votes against the firing. (Id.) Rumors began to circulate that the new Board would re-hire Goldberg when they came into office. (Id. ¶ 85.) Harisch forwarded Goldberg's December 19 email

6

scheduling a police chief examination to Schiliro (who had already received it) as "yet another great example of what we have discussed" and warned that he had to "take action to protect my family and me before she is hired back in 2014." (Id. ¶ 87.)

Following Goldberg's firing, the outgoing Town Supervisor informed the Westchester County Department of Human Resources that the Town would not be participating in the upcoming police chief examination. (Id. ¶¶ 89-91.)

Between December 23, 2013 and January 6, 2014, Harisch had five one-on-one meetings with three of the incoming Board members. (Id. ¶ 96.) They discussed the conflict between Harisch and Goldberg as well as prior corruption in the department. (Id.)

On January 8, 2014 the new Town Board unanimously rehired Goldberg as Town Administrator. (Id. ¶ 97.)

On January 16, 2014, Harisch filed a Notice of Claim[2] against Goldberg, the Town, and the Town Board. (Id. ¶ 99.) The Notice of Claim laid out the allegations detailed above. (NOC[3] 1-15.) It specifically alleged "egregious abuses, including attempted theft of overtime compensation, at the hands and direction of [Fisher]" and noted the "three-hour secret meeting with Respondent Goldberg to discuss the rampant abuses in the North Castle Police Department." (Id. 3.) The publicly filed

---

[2] New York law requires that claimants against local governments and the employees thereof file a notice of claim laying out the nature of the claims, the time, place, and manner in which the claims arose, and the claimant's injuries. See N.Y. Gen. Mun. Law § 50-e.
[3] The notation "NOC" refers to the Notice of Claim Harisch filed on January 16, 2014, which is available as ECF No. 23, Exh. C.

Notice of Claim thus explicitly referenced "abuse" and "corruption that transpired in connection with [Fisher]," as well as Goldberg's "complete control over [Fisher] based on her newfound, and secret knowledge of his illegal acts." (Id. 3-4.)

On January 29, 2014, Harisch met with the Westchester County District Attorney's Office Public Integrity Unit to discuss his allegations of corruption within the Department. (Am. Compl. ¶ 101.) That office declined to prosecute, instead referring the matter back to the Town for administrative review and further investigation. (Id.)

Harisch took on this internal investigation, and on February 17, 2014 sent an email to the Town Board and Town Attorney with some of his initial filings. (Id. ¶ 102.) The email catalogued a number of incidents, stretching back to 2001. (Id. ¶¶ 103-13.) Two days later the Town Board, through its counsel, indicated that it would not meet with Harisch to discuss these allegations. (Id. ¶ 115.)

The conflicts between Goldberg and Harisch picked up where they had left off. In late January 2014, the Town, at Goldberg's direction, began to pay Harisch for compensatory time at his salary when the hours were accrued, rather than his higher current base salary. (Id. ¶ 116.) This conflict generated a number of communications between Harisch, Goldberg, and the Board, as well as grievance on Harisch's behalf by the Police Benevolent Association, which is still pending. (Id. ¶¶ 116-22.)

On February 21, 2014, Harisch emailed the Town Board to contrast his compensation package with those of prior North Castle Chiefs of Police and other Police Chiefs in Westchester County.  (Id. ¶ 123.)

In March, Goldberg and Harisch again clashed, this time over whether Harisch was eligible for a mileage reimbursement stemming from an incident in which he drove his personal car to a house fire before his scheduled working hours. (Id. ¶¶ 126-29)  Harisch never received this reimbursement.  (Id. ¶ 130.)  A similar conflict emerged over whether Harisch was entitled to be paid for time he spent attending emergency medical training outside of normal working hours.  (Id. ¶¶ 131-33.)

On March 13, 2014, Schiliro directed Harisch to meet with the Town's outside labor lawyers to discuss the allegations in Harisch's Notice of Claim.  (Id. ¶ 134.) Harisch refused via an email from his own attorney.  (Id. ¶ 135.)

On April 2, 2014 Harisch sat for his 50-h examination.[4]  (Id. ¶ 137.)  The examination focused on Harisch's allegations of prior corruption in the North Castle Police Department.  (Id. ¶ 138.)  Following the examination, the Town Board asked Harisch to investigate the Department's records and illustrate the specific overtime abuse.  (Id. ¶ 142.)  He did, and reported his findings in a series of twenty-four emails to the Town Board and Town Attorney between April 2 and April 25.  (Id. ¶¶ 146-48.)

---

[4] New York law provides that any local government entity against which a notice of claim is filed has the right to examine the claimant under oath about the occurrence and his injuries.  See N.Y. Gen. Mun. Law § 50-h.

On April 5, 2014, Lieutenant Fisher resigned from the Police Department. (Id. ¶ 143.)  On April 30, 2014, Harisch, Fisher, D'Angelo, the Town Attorney, and two Board Members met to determine Fisher's terminal leave payout.  (Id. ¶ 153.) The participants ultimately negotiated to reduce this payout by $15,000.  (Id. ¶ 154-55.)

Harisch resigned on May 15, 2014 and returned to his position as lieutenant. (Id. ¶ 160.)  When Schiliro refused to have the Town Clerk read Harisch's resignation letter at the next Town Board meeting, Harisch read it instead.  (Id. ¶ 162.)  The letter referenced both the corruption allegations and the conflicts that had pitted Harisch against Goldberg and the Board.  (Id.)  On June 1, 2014, Simonson took over as provisional Chief.  (Id. ¶ 163.)  He was granted a take home car.  (Id.)

Goldberg was re-appointed as Town Administrator in September 2014, and in October 2014 she reduced Harisch's vacation days, sick leave entitlement, and personal leave days.  (Id. ¶¶ 165-66.)  The latter action caused the Police Benevolent Association to again file grievances on Harisch's behalf.  (Id. ¶ 166.)

B.    Litigation History

As noted above, Harisch filed a Notice of Claim in January 2014.  (Id. ¶ 99.) He filed a complaint in state court on November 19, 2014.  (ECF No. 1, Exh. A.) This complaint asserted causes of action for negligent hiring, reputational injury, common law retaliation through both diminished salary and withholding of pay and constructive discharge theories, statutory retaliation in violation of New York Labor

Law § 740(2)(a) again through both diminished salary and withholding of pay and constructive discharge theories, violation of 42 U.S.C. § 1983 through retaliation for exercising his right to freedom of speech, and the torts of injurious falsehood, intentional interference with prospective economic advantage, and prima facie tort. (Id. ¶¶ 163-206.)

On December 2, 2014, defendants removed to this Court.[5] (ECF No. 1.) On January 22, 2015, Harisch filed the operative Amended Complaint. (ECF No. 11.) The Amended Complaint asserts twelve causes of action. (Am. Compl. ¶¶ 167-233.) Eight of these are discussed below; plaintiff withdrew four (two theories of common law retaliation, reputational injury, and defamation) during a March 11, 2015 conference. (See ECF No. 24 at 7; ECF No. 28 at 28 n.19; ECF No. 33 passim.)

On April 29, 2015, Goldberg moved to dismiss the claims against her and the Town and Town Board similarly moved to dismiss the claims they faced. (ECF Nos. 22 & 25.) Harisch filed a joint opposition to both motions on June 12, 2015 (ECF No. 33), and this matter became fully briefed on July 2, 2015. (ECF Nos. 35 & 36.)

II.   PRINCIPLES OF LAW

A.   The Standard on a Motion to Dismiss

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a plaintiff must provide grounds upon which his

---

[5] This matter was originally assigned to Judge Kenneth M. Karas; it was reassigned to the undersigned on October 22, 2015, after briefing on the instant motion was complete.

claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. The Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). Knowledge and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b). A plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession and control of the defendant." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). But, if the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate. Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal,

556 U.S. at 679).  In deciding a 12(b)(6) motion, the Court may not consider evidence proffered by any party, but is instead limited to the allegations in the complaint and facts from documents either referenced therein or relied upon in framing the complaint.  See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

III.   DISCUSSION

A.   First Amendment Violation Under 42 U.S.C. § 1983

Count 1 of the Amended Complaint alleges that all defendants violated Harisch's constitutional right to free speech, protected by the First Amendment. (Am. Compl. ¶¶ 167-71.)  This count must be dismissed because the First Amendment does not prohibit retaliation against the speech Harisch undertook.

"A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (quoting Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011)).  Defendants argue that the Amended Complaint fails to state this claim because, as a public employee, Harisch's speech and conduct at issue were not protected from retaliation by the First Amendment.[6] Determining whether a public employee's speech is protected requires the Court to

---

[6] The Town defendants additionally argue that Harisch has failed to plead facts sufficient to establish that they, as opposed to Goldberg alone, were actually involved in the retaliatory acts.  (ECF No. 27 at 5-8.)  Because the Court concludes that the First Amendment does not prohibit retaliation for the speech at issue, it does not reach this argument.

first consider two questions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee." Id. (quoting Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011)). The Second Circuit has further propounded two inquiries to assist Courts to determine the second, 'spoke as a citizen,' question: "(A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" Id. at 173 (citing Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 593 F.3d 196, 203-04 (2d Cir. 2010)).

If the answer to either of the first two questions ('matter of public concern' or 'spoke as a citizen') is no, the First Amendment does not prohibit retaliation; if the answer to both is yes, the Court must consider "whether the relevant government entity 'had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" Id. at 172 (quoting Lane v. Franks, 134 S. Ct. 2369, 2380 (2014)).

As an initial matter, it is not entirely clear which incidents of speech Harisch alleges caused the retaliatory acts. In his opposition to defendants' motions for summary judgment, Harisch dedicates the most effort to the argument that "the filing of [his] Notice of Claim was protected under the Constitution." (ECF No. 33 at 18.) However, there are also references to "when he first went to Goldberg with details of the corruption," "when he later went to the Town Board," and certain "discuss[ions] with Schiliro" in which "Harisch informed both Schiliro and D'Angelo of the corruption, and Goldberg's knowledge of the corruption." (Id. at 19, 20.) In

14

order to draw all inferences in favor of the plaintiff for purposes of this motion, the Court will evaluate each of these alleged speech acts: Harisch's secret meeting with Goldberg in December 2012 (Am. Compl. ¶¶ 19-26); Harisch's one-on-one meetings with Town Board members in December 2013 and January 2014 (Id. ¶¶ 80-81, 95-96); Harisch's Notice of Claim, filed in January 2014 (Id. ¶¶ 98-100); and Harisch's emails to the Town Board and others in February[7] and April 2014.  (Id. ¶¶ 102-14, 142, 146-48.)

### 1.   The "Secret" Meeting with Goldberg

The first potentially protected speech is the three hour "secret" meeting between Harisch, Goldberg, and the Superintendent of the North Castle Highway Department on December 20, 2012.  (Id. ¶¶ 19-26.)  The context and content of this meeting indicate that, as a matter of law, Harisch spoke not as a citizen but solely as a public employee.  He therefore cannot maintain a First Amendment retaliation claim predicated on his speech at this meeting.

"The inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule. Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two."  Ross v. Breslin, 693 F.3d 300, 306 (2d Cir. 2012).  In

---

[7] Harisch argues that, in going to the Town Board, he "was in no way looking for personal gain" (ECF No. 33 at 19), and thus he does not appear to allege that his February 21, 2014 email to the Town Board is speech the First Amendment protects from retaliation.  That email did not discuss corruption allegations but instead was limited to comparing Harisch's compensation with those of other Chiefs of Police and officers in the North Castle Police Department.  (Am. Compl. ¶ 123.)  This concession, if it is one, is well-founded; an email surveying the salaries of various positions and asking the Board "what do you feel is truly fair over-all as compensation" (id.) is a quintessential matter of personal, rather than public, concern, and "government offices could not function if every employment decision became a constitutional matter."  Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (quoting Connick v. Myers, 461 U.S. 138, 143 (1983)).

this case, the information Harisch relayed to Goldberg was "[v]ery focused" and almost entirely "limited to Lieutenant Fisher and Officer Lander," with some small amount dedicated to actions by Lieutenant Simonson.  (50-h Tr.[8] at 237:10-15, 34:2-17.)  The specific instances of improper or illegal accounting for time that Harisch documented and discussed were "discovered … [when] he was in charge of the schedule," and thus pursuant to his professional duties.  (Am. Compl. ¶ 24.)  During his 50-h examination, Harisch repeatedly dated his investigation into his co-workers' corrupt timekeeping to "when [he] became lieutenant and … was running the schedule."  (50-h Tr. at 51:17-19; see also id. at 135:8-19.)  Harisch was not only a police officer charged with upholding the law, but specifically the scheduling officer charged with maintaining the department's records, and it was in this capacity that he investigated and pursued the allegations he shared during the December 2012 meeting.

The fact that Harisch's speech was directed to Goldberg, the Town Administrator, rather than his immediate superiors in the Police Department, does not change this calculus.  The same was true in Ross v. Breslin, 693 F.3d 300 (2d Cir. 2012), in which the Second Circuit held that the First Amendment did not prohibit retaliation against a public employee who was tasked with discovering pay irregularities and who did report such irregularities to people senior to her

---

[8] The notation "50-h Tr." refers to the transcript of Harisch's April 3, 2014 50-h examination, which is available as ECF No. 26, Exh. B.  The transcript is properly incorporated into the pleadings and considered in the context of this motion to dismiss under Rule 12(b)(6) because it is both extensively referred to and indeed quoted in the Amended Complaint.  (See Am. Compl. ¶ 140.)  See Avon Pension Fund v. GlaxoSmithKline PLC, 343 F. App'x 671, 674 n.2 (2d Cir. 2009); Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).

immediate supervisor.  Id. at 302.  The Second Circuit explicitly held that "[t]aking a complaint up the chain of command to find someone who will take it seriously 'does not, without more, transform [a public employee's] speech into protected speech made as a private citizen.'"  Id. at 307.  So too in this case, where Harisch bypassed the prior Chief and the provisional Chief, convinced that neither of them would act, in favor of the newly appointed Town Administrator.  (50-h Tr. at 193:4-24.)

The Second Circuit has explicitly identified "whether the complaint was also conveyed to the public" as a question that "may properly influence a court's decision" as to whether a public employee is speaking pursuant to his official duties.  Ross, 693 F.3d at 306.  This inquiry well serves the First Amendment's purposes related to fostering an informed public; as the Second Circuit has noted, where speech "ha[s] been publicly disclosed" and has generated a "public controversy," "the public's interest in receiving the well-informed views of the [relevant] government employee [are] strong."  Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 593 F.3d 196, 205 (2d Cir. 2010) (internal quotation marks and citation omitted); cf. Reuland v. Hynes, 460 F.3d 409, 418 (2d Cir. 2006) (concluding that a statement was protected, in part because "the statement was made in an interview with a magazine with public circulation and not simply to co-workers").

The December 2012 meeting was a "secret."  (Am. Compl. ¶ 19.)  Harisch's allegations of corruption were not published to the public, nor were the timekeeping practices of certain North Castle police officers the subject of a public controversy.

17

The Amended Complaint identifies January 16, 2014, the date of "the filing of the Notice of Claim," as the date on which "the issue of police corruption had been publicly disclosed." (Id. ¶ 99.)  The secrecy of this meeting, exclusively attended by Town employees and dedicated to discussing other Town employees' abuse of Town policies, further indicates that the speakers at the meeting were not speaking as citizens.

Harisch's opposition to defendants' motions to dismiss argues that the Court should consider a draft article on police corruption Harisch apparently wrote and shared with a journalist in 2007.[9]  (ECF No. 33 at 20 & Exh. B.)  The fact of this draft, Harisch argues, amounts to "go[ing] public with his concerns of rampant police corruption."  (Id. at 20.)  In deciding a motion to dismiss, the Court cannot consider any party's proffered evidence beyond and not incorporated into the complaint, and the Amended Complaint nowhere mentions this email or any 2007 interaction between Harisch and any member of the media.  Moreover, even if the Court were to consider the email, it would hardly demonstrate that this matter was public; the body of the email explicitly requests that the recipient "not publish anything without [Harisch's] consent," and the fact that Harisch only offers an email as opposed to any published result strongly suggests that his consent was ultimately never delivered.  (Id. Exh. B.)

---

[9] The same sentence also includes a reference to "speaking with the Attorney General's Office" (ECF No. 33 at 20), an alleged new fact that is not referenced in the Amended Complaint nor further explained in Harisch's submissions.

One recent Second Circuit decision is instructive for its use of counterfactuals that closely resemble the conditions in this case.  In Matthews v. City of New York, 779 F.3d 167 (2d Cir. 2015), the Second Circuit concluded that a police officer was speaking as a citizen when he notified the commanding officer of his precinct that "supervisors in the Precinct [had] implemented a quota system" for arrests, summons, and stop-and-frisks.  Id. at 169.  In reaching this determination, the Second Circuit highlighted several facts about the speaking officer: he "ha[d] no duty to monitor the conduct of his … supervisors;" "policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work;" and he "was not flagging specific violations of law, but rather expressing an opinion on a policy."  Id. at 171, 174, 175.

Each of these indicators that the plaintiff in Matthews spoke as a citizen points in the opposite direction in the instant case.  As scheduling officer, Harisch had an explicit duty to monitor the conduct of the officers he discovered to be engaged in wrongdoing; speech regarding faulty timekeeping was part of his functional job description and part of his work, as evidenced by his repeated prior attempts to address the same concerns (see, e.g., 50-h Tr. at 22:4-16; 28:9-29:13); and Harisch was flagging specific violations of law and rules, rather than discussing a department-wide policy.  The secret meeting was "'part-and-parcel of [Harisch's] concerns' about his ability to 'properly execute his duties'" as a police lieutenant, and was thus "in furtherance of the execution of one of [his] core duties."  Weintraub

v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 593 F.3d 196, 203 (2d Cir. 2010)

(quoting Williams v. Dallas Indep. Sch. Dist., 480 F.3d 689, 694 (5h Cir. 2007)).

Considered as a whole, the context and content of the December 2012 meeting demonstrate that, as a matter of law, Harisch was not speaking as a citizen but instead solely as a public employee.  This meeting therefore cannot serve as the basis for a First Amendment retaliation claim.  E.g., Matthews, 779 F.3d at 172.

### 2.    The Meetings with Members of the Town Board

The same logic and precedent that applies to the secret meeting between Harisch and Goldberg in December 2012 applies more forcefully to the in-person meetings between Harisch and members of the Town Board in December 2013 and January 2014.  Harisch's Amended Complaint recounts these meetings and emphasizes the detail Harisch provided about his conflicts with Goldberg.  (Am. Compl. ¶¶ 95-96.)  It only alleges that Harisch told the Board Members of Goldberg's "knowledge of prior corruption" and showed them envelopes and boxes "that contained documentary proof of past corruption."  (Id. ¶ 96.)  This is consistent with Harisch's testimony at his 50-h examination, in which he stated that he "didn't get into" "[t]he specifics about this happened and that happened," but instead gave the Board Members "an overview, a real Readers Digest version to emphasize the point to look into the amount of documentation."  (50-h Tr. at 119:4; 119:2-3; 127:10-13.)

The allegations of timekeeping abuse by certain members of the North Castle Police Department did not become public through these meetings, nor had the

circumstances under which Harisch investigated and pursued this corruption become any less part of his official duties.  Indeed, the opposite had occurred, as Harisch was at this point the Chief of Police, and as such even more responsible for adherence to his Department's policies than he had been as a scheduling officer. The addition of employment-centered complaints about Goldberg does not elevate speech made as an employee under the previous analysis to speech made as a citizen.  Therefore these meetings are equally unavailable as a basis for a First Amendment retaliation claim.

3. <u>The Notice of Claim</u>

In addition to the reasoning above, Harisch's Notice of Claim was not protected speech because lawsuits that seek predominantly or entirely personal relief to redress personal grievances are not speech on a matter of public concern.

In <u>Ruotolo v. City of New York</u>, 514 F.3d 184 (2d Cir. 2008), the Second Circuit rejected a former police officer's argument that his lawsuit could be the basis of a First Amendment retaliation claim.  The plaintiff in <u>Ruotolo</u> had identified two instances of speech that he claimed led to unlawful retaliation: first, a report about health conditions in the precinct, and second, a lawsuit he filed after the report led to retaliation.  <u>Id.</u> at 186.  The district court dismissed the suit entirely on the basis of <u>Garcetti</u>, reasoning that the report was created as part of the officer's official duties and the lawsuit could not provide an independent ground because it was based on retaliation for non-actionable official speech.  <u>Id.</u> at 189.  The plaintiff "concede[d] that <u>Garcetti</u> mandates dismissal of the First Amendment claim

21

premised on the … Report," but appealed the dismissal of his claim premised on his suit.  Id. at 188.

The Second Circuit affirmed, but on "a simpler ground" than the district court had identified: the lawsuit was not speech "on a matter of public concern."  Id. at 189.  The plaintiff's "lawsuit sought to redress his personal grievances. It did not seek to advance a public purpose."  Id.  In reaching that conclusion, the Second Circuit examined the suit itself.  The alleged retaliation related to "the circumstances and perquisites of his employment, such as reassignment, transfer, time off, and discipline."  Id. at 190.  The alleged injuries were "adverse career, financial and emotional effects that [the plaintiff] suffered personally."  Id.  And "[t]he relief sought [was] also almost entirely personal to [the plaintiff.]"  Id.  The fact that some of the issues surfaced in the complaint "arguably hint[ed] at some broader public purpose" was not enough, because it amounted to at most "[a] generalized public interest in the fair or proper treatment of public employees."  Id.  The Second Circuit endorsed the Eleventh Circuit's observation that "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run," and dismissed the plaintiff's suit.  Id. (quoting Boyce v. Andrew, 510 F.3d 1333, 1343 (11th Cir. 2007)).

The Second Circuit's analysis of the lawsuit at issue in Ruotolo maps easily onto the Notice of Claim Harisch filed in January 2014.  The Notice of Claim, a necessary precursor to a lawsuit in these circumstances under New York law,

alleges that Goldberg attempted to dissuade Harisch from becoming Police Chief by interfering with "the circumstances and perquisites of his employment," such as his compensation package, his access to a take home car, and his entitlement to certain reimbursements.  (NOC passim.)  It alleges that Goldberg sought "to destroy [Harisch's] business reputation" and took actions "with no other intention than to cause him significant reputational and economic damage."  (Id. at 1, 9.)  The relief it seeks are compensatory and punitive damages, rather than any form of injunctive relief aimed at a broader public purpose.  (Id. at 15-16.)  In short, Harisch's Notice of Claim shares all of the qualities of the lawsuit in Ruotolo that led the Second Circuit to conclude that it was not on a matter of public concern.  See also Golodner v. Berliner, 770 F.3d 196, 204 (2d Cir. 2014) ("In this type of case, our discussion of what constitutes speech on a purely private matter has always been closely tethered to an individual employee's conditions of employment." (internal quotation marks and citation omitted)).  The fact that a lawsuit seeking personal relief for personal grievances is set against the backdrop of administration of a town government or the health conditions of a police precinct does not suffice to make it the foundation of a First Amendment retaliation claim.

                4.      The Investigation Emails

Like the Notice of Claim, the emails Harisch sent to the Town Board and others in February and April 2014 documenting prior corruption have an additional reason they cannot be the basis of a First Amendment retaliation claim.  This speech, more clearly than any of the others, "owes its existence to a public

employee's professional responsibilities." <u>Garcetti</u>, 547 U.S. at 421. The emails were drafted when Harisch "went to work and performed the tasks he was paid to perform" as Chief of Police. <u>Id.</u> at 422. The Amended Complaint is clear on this point: it states that when the Westchester County District Attorney's Office referred allegations of corruption to the Town for internal review, "as the Head of the Police Department, the task of spearheading the review and further investigation and officially presenting documentation of all the corruption to the Town Board fell back onto Harisch," and that following his 50-h examination "the Town finally asked him to carefully go through Police Department records and illustrate the specific overtime abuse." (Am. Compl. ¶¶ 101, 142.) The emails are thus the clearest example of speech that was "part and parcel of [Harisch's] official responsibilities," and was for that reason made not as a citizen but instead solely as a public employee. <u>Ross v. Breslin</u>, 693 F.3d 300, 306 (2d Cir. 2012). This speech, like all of the speech at issue in this case, is not a proper basis for a First Amendment retaliation claim, and thus this claim must be dismissed.

     B.    <u>Retaliation Under New York Civil Service Law § 75-b</u>

     Counts 2 and 3 of the Amended Complaint allege that all defendants violated New York Civil Service Law § 75-b by improperly subjecting Harisch to adverse employment actions, specifically pay not commensurate with his position, improper withholding of reimbursement, refusal to pay for attending a training session, and constructive discharge. (Am. Compl. ¶¶ 172-82.) These counts must be dismissed

because Harisch waived them when he instituted an action under New York Labor Law § 740 in his original complaint.

Labor Law § 740(2) prohibits an employer from "tak[ing] any retaliatory personnel action against an employee because such employee … discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety." However, this statute does not govern claims brought by public employees, who must instead invoke the similar protection of Civil Service Law § 75-b(2)(a).  Hanley v. New York State Exec. Dep't, Div. for Youth, 589 N.Y.S.2d 366, 367-68 (App. Div. 1992).  That statute prohibits a public employer from taking "adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action."

As discussed above, Harisch brought claims under Labor Law § 740 in his original Complaint (Compl. ¶¶ 184-91), which he withdrew in favor of claims under Civil Service Law § 75-b in his Amended Complaint.  (Am. Compl. ¶¶ 172-82.)  This sequence presents an insurmountable obstacle to recovery on these claims due to Labor Law § 740(7)'s waiver provision, which provides that "the institution of an

action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law."

"This is an unusual statute."  Reddington v. Staten Island Univ. Hosp., 893 N.E.2d 120, 128 (N.Y. 2008) (Smith, J., dissenting in part).  But unusual or not, it has been the subject of reasoned interpretation by earlier courts and plainly serves to bar Harisch's claims under Civil Service Law § 75-b in this circumstance.

First, it is clear that the waiver is triggered at the filing of a claim under Labor Law § 740 and cannot be undone by amending one's complaint to omit the claim.  This is so even if, as here, the § 740 claim suffered a fatal flaw from the start.  The New York Court of Appeals rejected precisely this argument in Reddington v. Staten Island University Hospital, 893 N.E.2d 120 (N.Y. 2008), a case in which that court answered two certified questions from the Second Circuit.  See Reddington v. Staten Island Univ. Hosp., 511 F.3d 126 (2d Cir. 2007).  In Reddington, the plaintiff filed a time-barred claim under Labor Law § 740 in her original complaint and withdrew the claim in her amended complaint.  893 N.E.2d at 123.  Plaintiff argued that the futility of her original claim as well as its withdrawal precluded waiver, but the Court of Appeals concluded that "section 740(7)'s language and legislative history do not support her position."  Id. at 124. Instead, "[t]he plain text of this provision indicates that 'instituting' an action— without anything more—triggers waiver."  Id. (alteration in original omitted); see also Maccagno v. Prior, 910 N.Y.S.2d 646 (Mem) (App. Div. 2010) ("[P]laintiff

inadequately pleaded a cause of action under the Whistleblower Law, but in doing so, elected a remedy that effectively waived any other rights and remedies it had.").

"While it is … clear that the institution of a Section 740 claim triggers the waiver provision, the scope of the statutory waiver is less clear." Barker v. Peconic Landing at Southold, Inc., 885 F. Supp. 2d 564, 568 (E.D.N.Y. 2012). Facially, the statute "would seem to provide that when an employee brings a whistleblower suit, all concurrent or future lawsuits brought by that employee, in any capacity whatsoever, are waived." Collette v. St. Luke's Roosevelt Hosp., 132 F. Supp. 2d 256, 262 (S.D.N.Y. 2001). Such a reading would create internal contradictions, external ambiguity, and lead to absurd results from a statute aimed at protecting whistleblowers; consequently, "some limitation on the rights and remedies waived by a whistleblower plaintiff must be read into the statute." Id. at 264.

Courts continue to disagree over the proper scope of § 740(7)'s waiver, but have effectively sorted into two camps. The stricter view holds that "the waiver applies to claims that relate to the same retaliatory action on which the Section 740 claim is based." Cabrera v. Fresh Direct, LLC, No. 12-CV-6200 (PKC)(RER), 2013 WL 4525659, at *2 (E.D.N.Y. Aug. 27, 2013) (collecting cases). The less strict view "allows plaintiffs to bring 'legitimately independent claims' not related to whistleblowing even if the claims have overlapping facts, such as the same underlying retaliatory action." Id. (collecting cases) (quoting Collette, 132 F. Supp. 2d at 274). The latter interpretation would, for example, not bar an age discrimination claim predicated on the same firing that formed the basis of

27

plaintiff's earlier § 740 retaliation claim.  See id. at *3 (noting that laws protecting whistleblowers and laws prohibiting discrimination "seek to remedy separate wrongs").

Harisch argues that his claims under Civil Service Law § 75-b should survive because, although they relate to the same underlying retaliatory actions, those actions were based on more than just his disclosure of corruption.  That argument is both factually and legally flawed.

First, a comparison of the claims in the two complaints reveals that the substantive paragraphs setting out Harisch's claims under Civil Service Law § 75-b in the Amended Complaint are copied and pasted from the claims under Labor Law § 740 in the original Complaint; the only difference is the additional assertion that Harisch is a public employee.  (Compare Compl. ¶¶ 184-87; 189-91, with Am. Compl. ¶¶ 172-75; 178-80.)  The activities that Harisch now argues provide a non-whistleblowing rationale for defendants' actions, specifically "illuminating Goldberg's many indiscretions to Town Board members" and "filing a Notice of Claim," were specifically listed as bases for Harisch's § 740 claim.  (Compl. ¶¶ 185-87; 190.)  There is no daylight between the two sets of allegations, and because the facts entirely overlap the Civil Service Law § 75-b claims are waived by the operation of Labor Law § 740(7).

Second, even if Harisch had alleged that defendants violated § 75-b by retaliating against him for disclosures he had not referenced in his original Complaint, this narrow factual distinction would not escape the waiver.  The two

statutes Harisch sequentially invoked, Labor Law § 740 and Civil Service Law § 75-b, are textually nearly identical because they are aimed at the same wrong: "both statutes prohibit employers from taking retaliatory actions against their employees for disclosing wrongful activities by their employers." <u>Hanley v. New York State Exec. Dep't, Div. for Youth</u>, 589 N.Y.S.2d 366, 368 (App. Div. 1992).  Indeed, the Civil Service Law ties the proper resolution of § 75-b retaliation claims to the rules governing § 740 retaliation claims by establishing that, unless arbitration is required, a public employee "may commence an action in a court of competent jurisdiction under the same terms and conditions as set forth in article twenty-C of the labor law," which is codified as § 740.  <u>Catapano-Fox v. City of New York</u>, No. 14 Civ. 8036(KPF), 2015 WL 3630725, at *8 (S.D.N.Y. June 11, 2015) (quoting N.Y. Civ. Serv. Law § 75-b(3)(c)).  Other than the nature of the employer, the causes of action are the same, and as such all claims Harish makes under § 75-b are waived.

    C.   <u>Prima Facie Tort</u>

Count 6 of the Amended Complaint alleges that all defendants committed a prima facie tort against Harisch.  (Am. Compl. ¶¶ 194-96.)  This count must be dismissed because the Amended Complaint does not plead special damages and also does not adequately plead that disinterested malevolence was defendants' sole motive.

"The requisite elements of a cause of action for prima facie tort are (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be

lawful." <u>Freihofer v. Hearst Corp.</u>, 480 N.E.2d 349, 355 (N.Y. 1985).  "[P]rima facie tort was designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy, and not to provide a 'catch-all alternative for every cause of action which cannot stand on its legs.'" <u>Bassim v. Hassett</u>, 585 N.Y.S.2d 566, 568 (App. Div. 1992) (quoting <u>Belsky v. Lowenthal</u>, 405 N.Y.S.2d 62, 65 (App. Div. 1978)).  "However, where a traditional tort remedy exists, a party will not be foreclosed from pleading, as alternative relief, a cause of action for prima facie tort."  <u>Freihofer</u>, 480 N.E.2d at 355.

"A critical element of the [prima facie tort] cause of action is that plaintiff suffered specific and measurable loss, which requires an allegation of special damages."  <u>Id.</u>  "Under New York law, special damages must be pled with particularity."  <u>Bradley v. Nat'l R.R. Passenger Corp. (Amtrak)</u>, 797 F. Supp. 286, 295 n.12 (S.D.N.Y. 1992).

Harisch's Amended Complaint never identifies any specific amount of damages in association with the prima facie tort cause of action or any other.  (Am. Compl. ¶¶ 194-96; p. 80.)  Although the Amended Complaint does contain the conclusory allegation that defendants' prima facie tort "caused Harisch specific and quantifiable monetary loss," there is no attempt to state this loss generally, much less with the particularity New York law requires.  (<u>Id.</u> ¶ 196.)  This allegation of special damages is conclusory and does not meet the pleading rules by which a prima facie tort might survive a motion to dismiss.  <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 663 (2009) ("[T]he tenet that a court must accept a complaint's allegations as

true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements.").

Harisch attempts to patch up this deficiency by directing the Court to paragraph 123 of the Amended Complaint, in which he quotes from an email he sent to the Town Board on February 21, 2014.  In that email he compared his compensation package to those of other officers in the department and calculated that, among other figures, his package was $44,872.62 less than the package the prior Chief enjoyed in 2010.  (Am. Compl. ¶ 123.)  However, there is nothing in the paragraphs setting out Harisch's prima facie tort cause of action that refers to this email or figure (see id. ¶¶ 194-96), and it at best covers only "reducing Harisch's compensation not commensurate with his position," which is only one of six wrongs that Harisch alleges underpin his prima facie tort claim.  (Id. ¶ 195.)  This stray figure from elsewhere in the Amended Complaint does not meet the pleading requirements for this cause of action.

"Additionally, central to a cause of action alleging prima facie tort is that the [defendant's] intent was motivated solely by malice or 'disinterested malevolence.'" Diorio v. Ossining Union Free Sch. Dist., 946 N.Y.S.2d 195, 198 (App. Div. 2012) (quoting Simaee v. Levi, 802 N.Y.S.2d 493, 497 (App. Div. 2005)).  "[M]otives other than disinterested malevolence, 'such as profit, self-interest, or business advantage' will defeat a prima facie tort claim."  Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 571 (2d Cir. 1990) (quoting Marcella v. ARP Films, Inc., 778 F.2d 112, 119 (2d Cir. 1986)).  Malice must truly be the sole motive; "[i]f the defendant acts

from mixed motives, a claim for prima facie tort is not made out." <u>Sadowy v. Sony</u>

<u>Corp. of Am.</u>, 496 F. Supp. 1071, 1077 (S.D.N.Y. 1980).

There is no claim for prima facie tort against a tortfeasor who benefits from

the actions alleged to be tortious.  This includes circumstances in which the benefit

is political gain.  Thus, in <u>Roper v. Hynes</u>, No. 05 Civ. 7664 (WHP), 2006 WL

2773032 (S.D.N.Y. Sept. 27, 2006), the court granted defendant's motion to dismiss

plaintiff's prima facie tort claim because "the Complaint on its face allege[d]" that

the defendant undertook his actions "not only to harm [plaintiff] but also to

eliminate her as a political rival."  <u>Id.</u> at *14.

The same result obtains here.  The Amended Complaint alleges that the

secret meeting in December 2012 gave Goldberg "complete control over the

provisional chief based on her newfound, and secret knowledge of his illegal acts,"

and explicitly alleges that she offered Harisch a lower compensation package

"because he had brought to light rampant and long-standing corruption in the police

department, information she could no longer utilize for control purposes."  (Am.

Compl. ¶¶ 27, 61; <u>see also</u> <u>id.</u> ¶ 30 ("Goldberg found advantages in her newfound

friendship with the provisional chief.").)  In light of these alternative explanations

in the Amended Complaint, which are not only present but form the basis of

Harisch's retaliation claims, the conclusory allegation that defendants were "solely

motivated by a disinterested malevolence towards Harisch without excuse or

justification" is insufficient to properly make out a prima facie tort claim.  (<u>Id.</u> ¶

195.)

32

D.   Negligent Hiring, Supervision, and Retention

Counts 7, 8, and 9 of the Amended Complaint allege that the Town and Town Board were grossly negligent in their hiring, supervision, and retention of Goldberg. (Am. Compl. ¶¶ 197-209.)  These counts must be dismissed because Goldberg was unambiguously acting within the scope of her employment when she undertook the acts Harisch faults.

Claims of negligent hiring, supervision, or retention "require allegations that the defendant knew or should have known of its employee's propensity to engage in the conduct that caused the plaintiff's injuries, and that the alleged negligent [hiring,] supervision or retention was a proximate cause of those injuries."  Gray v. Schenectady City Sch. Dist., 927 N.Y.S.2d 442, 445 (App. Div. 2011).  Moreover, these torts apply only "[i]n instances where an employer cannot be held vicariously liable for an employee's torts."  State Farm Ins. Co. v. Cent. Parking Sys., Inc., 796 N.Y.S.2d 665, 666 (App. Div. 2005).  In order to make out a claim for negligent hiring, supervision, or retention, "[t]he employee … must not be acting within the scope of his or her employment."  Gray, 927 N.Y.S.2d at 446.

"An act is considered to be within the scope of employment if it is performed while the employee is engaged generally in the business of his employer, or if his act may be reasonably said to be necessary or incidental to such employment."  Holmes v. Gary Goldberg & Co., 838 N.Y.S.2d 105, 106 (App. Div. 2007) (quoting Davis v. Larhette, 834 N.Y.S.2d 280, 283 (App. Div. 2007)).  The New York Court of Appeals has identified several factors to be weighed in the determination, including

33

> the connection between the time, place and occasion for the act; the
> history of the relationship between employer and employee as spelled
> out in actual practice; whether the act is one commonly done by such
> an employee; the extent of departure from normal methods of
> performance; and whether the specific act was one that the employer
> could reasonably have anticipated.

Riviello v. Waldron, 391 N.E.2d 1278, 1281 (N.Y. 1979).

In some circumstances, the proper scope of an individual's employment

presents a question of fact. See, e.g., Riviello, 391 N.E.2d at 1281 ("[T]he question is

ordinarily one for the jury."). In others, however, it can be determined from the face

of a complaint. See, e.g., Watson v. Strack, 5 A.D.3d 1067, 1068 (App. Div. 2004)

(reversing trial court's grant of leave to amend because proposed causes of action for

negligent hiring, supervision, and retention would be "palpably insufficient as a

matter of law" where defendant's employee rear-ended plaintiff while driving a

defendant-owned vehicle during work hours). As with any substantive assertion in

a complaint, the facts alleged in support of a cause of action for negligent hiring,

supervision, or retention must support a plausible argument that the employee's

actions were outside the scope of her employment. See Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007).

In this case, every action by Goldberg that Harisch alleges harmed him and

which could have conceivably been proximately caused by the Town and Town

Board's negligence in hiring, supervising, and retaining her were plainly within the

scope of her employment. Goldberg is alleged to have improperly offered Harisch

too little compensation (Am. Compl. ¶¶ 36, 60), improperly attempted to create a

new bureaucratic position (id. ¶ 42), improperly disciplined Harisch (id. ¶ 71),

improperly characterized whether Harisch intended to keep his job in an email (id. ¶ 75), and improperly withheld certain reimbursements and payments (id. ¶¶ 116, 130, 132).  Whether or not these actions were justified or even retaliatory, each and every one was unambiguously part of Goldberg's role as Town Administrator.  All advanced the Town and Town Board's business, and each was the type of action that the Town and Town Board would reasonably anticipate, and indeed expect, a person in Goldberg's position to undertake.  In light of the unambiguous factual allegations throughout the Amended Complaint, Harisch's conclusory declarations that Goldberg's actions were "committed outside of the scope of her employment as Town Administrator" and "not congruous with the expected regular and routine functions of the Town Administrator" do not suffice to survive a motion to dismiss.

Harisch points out that an employer can still face claims for negligent hiring, supervision, or retention based on an employee's actions within the scope of her employment "when punitive damages are sought based upon facts evincing gross negligence in the hiring[, supervision,] or retention of an employee."  Coville v. Ryder Truck Rental, Inc., 817 N.Y.S.2d 179, 180 (App. Div. 2006).  However, the New York "Court of Appeals has clearly held that the State and its political subdivisions … are not subject to punitive damages."  Karoon v. New York City Transit Auth., 659 N.Y.S.2d 27, 29 (App. Div. 1997) (citing Sharapata v. Town of Islip, 437 N.E.2d 1104, 1105 (N.Y. 1982)).  This exception is therefore unavailable to save Harisch's claims against the Town and the Town Board for negligent hiring, supervision, and retention from dismissal as a matter of law.

E.   Intentional Interference with Prospective Economic Advantage

Count 12 of the Amended Complaint alleges that Goldberg improperly and intentionally interfered with Harisch's business relationship with the Town Board. (Am. Compl. ¶¶ 228-33.)  This final count must be dismissed because Goldberg's alleged conduct does not rise to the level of culpability required to carry such a claim.

Under New York law, a claim for tortious interference with prospective business relations is made out when "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008).  To succeed on a claim for this tort a "plaintiff must show more culpable conduct on the part of the defendant" than he is required to when the defendant is alleged to have interfered with a binding contract.  Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004) (quoting NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc., 664 N.E.2d 492, 496 (N.Y. 1996)).  "[A]s a general rule, the defendant's conduct must amount to a crime or an independent tort."  Id.  There is an exception "where a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs.'"  Id. (quoting NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp. Inc., 628 N.Y.S.2d 408, 410 (App. Div. 1995)).  The New York Court of Appeals has also suggested that some other "wrongful means," including inter alia "physical violence, fraud or

36

misrepresentation" might suffice.  Id. at 1104 (quoting Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 406 N.E.2d 445, 449 (N.Y. 1980)).  But it has never explicitly recognized such an exception, and it "has never held that any misrepresentation to a third party is sufficient to sustain a claim for tortious interference with prospective economic relations."  Friedman v. Coldwater Creek, Inc., 321 F. App'x 58, 60 (2d Cir. 2009).

The conduct that Harisch alleges tortiously interfered with his prospective economic relationship with the Town Board was Goldberg's email to Westchester County falsely stating that Harisch intended to step down as Police Chief.  (Am. Compl. ¶¶ 75, 230.)  This act does not, as a matter of law, reach the level required to state a competent claim for this tort.  Harisch has not alleged that it was unlawful or an independent tort and the Court sees no theory under which it could be. Although the email was, according to the Amended Complaint, a misrepresentation, it was not one that amounts to the kind of "more culpable" conduct this tort requires; as the Second Circuit has recognized, New York law has never suggested that a lie, without more, can sustain the "wrongful means" exception; indeed, New York courts have never even explicitly recognized that this exception exists.  E.g., Friedman, 321 F. App'x at 60.

The email also falls outside of the one recognized exception to the crime or independent tort requirement, that which covers conduct undertaken for the sole purpose of inflicting harm.  As discussed above in the context of Harisch's claim for a prima facie tort, the Amended Complaint is shot-through with explanations of the

37

benefits Goldberg would reap if Harisch left his post; these benefits are the crux of the theory underlying Harisch's First Amendment retaliation claim.  The tort of intentional interference with economic advantage only relaxes its "general rule [that] the defendant's conduct must amount to a crime or an independent tort" if the sole purpose of the less-culpable conduct was harming the plaintiff.  The allegations in the Amended Complaint prevent such a finding, and thus do not state this claim.

IV.   CONCLUSION

For the reasons discussed above, the defendants' motions to dismiss are GRANTED.  The Clerk of Court is directed to terminate the motions at Docket Nos. 22 & 25 and to terminate this action.


SO ORDERED.

Dated:      New York, New York
            March 25, 2016


_____
        KATHERINE B. FORREST
        United States District Judge